Rel: April 11, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2024-2025

_____

### CL-2024-0513

_____

**Elizabeth Jane Beyke**

**v.**

**Mary Jane Marquart and Shannion R. Brown**

_____

### CL-2024-0527

_____

**Mary Jane Marquart and Shannion R. Brown**

**v.**

**Elizabeth Jane Beyke**

**Appeals from Lauderdale Circuit Court**
**(CV-22-900249)**

FRIDY, Judge.

Elizabeth Jane Beyke appeals from a summary judgment the Lauderdale Circuit Court ("the trial court") entered in favor of Mary Jane Marquart and Shannion R. Brown in this boundary-line dispute between adjoining lot owners in a subdivision. Marquart and Brown conditionally cross-appeal, asking that, if this court reverses the summary judgment, we also instruct the trial court to reinstate the claims that they asserted against Beyke but that the trial court dismissed. For the reasons set forth herein, we reverse the summary judgment and remand the cause to the trial court for further proceedings.

Background

On November 7, 2022, Marquart and Brown filed a verified complaint in the trial court asking it to determine the boundary line between their lot ("the north lot") and Beyke's lot ("the south lot") in the Oak Hill Subdivision in Florence.[1] They asserted claims of trespass,

_____

[1]Marquart and Brown also named Beyke's mother and two brothers, co-owners of the south lot, as defendants. Beyke and her mother lived in the house they built on the south lot. The brothers have never lived in the house, they did not join Beyke in challenging the boundary-line as Marquart and Brown define it, and they are not involved in the appeal or the cross-appeal. Beyke's mother died in June 2003, and Beyke has continued to live in the house on the south lot. For purposes of this

slander of title, and nuisance; they also requested injunctive relief, as well as the ejectment of Beyke from the strip of land created by the difference in the boundary lines that each party claimed ("the disputed strip"). On December 16, 2022, Beyke answered the complaint, pleading the affirmative defense of adverse possession of the disputed strip. In her answer, Beyke wrote that her defense of adverse possession was not an admission that she was not the true owner of the disputed strip. Beyke also asserted counterclaims mirroring the claims set forth in Marquart and Brown's complaint, with the exception of the claim for injunctive relief.

On February 8, 2024, Marquart and Brown filed a motion for a summary judgment contending that, as a matter of law, Beyke could not prevail on her affirmative defense of adverse possession. Beyke opposed the motion. Both parties filed voluminous evidentiary submissions in support of their respective positions. A map depicting the lots in the subdivision, as well as two surveys admitted into evidence, indicate that the south lot, on which Beyke lives, lies directly to the south of the north

opinion, therefore, we will refer to Beyke as though she were the sole owner of the south lot.

lot, on which Marquart and Brown live. In other words, the northern edge of the south lot is the southern edge of the north lot. The lots are rectangular, with the longer edge lying east to west and running from the parties' front yards on the eastern sides of the lots to their backyards on the western sides of the lots.

In her deposition, which was included as part of the evidentiary submissions of both parties, and in her affidavit submitted with her opposition to the motion for a summary judgment, Beyke testified that she purchased the south lot on April 17, 1995, and proceeded to build her house on the lot. When she purchased the lot, she said, a wooden fence ("the fence") had already been erected on the west or back portion of the north lot, which at that time was owned by "the Templetons." Beyke testified that from the time she purchased her lot, she believed that the fence constituted the boundary line between the south lot and the north lot. She said that she had placed sod in her yard up to the fence and the fence line, mowed the yard up to the fence and the length of the yard along the fence line running the length of the yard, and did other yard maintenance up to the fence and along the fence line. She said she also

4

maintained her side of the fence. She said that she had made repairs to the fence and had put sealant on it twice.

Beyke submitted the affidavit of Jason Akin, who had owned the north lot from April 17, 2017, until he sold it to Marquart and Brown on March 9, 2020.[2] Akin corroborated Beyke's testimony indicating that she did yardwork up to the fence and maintained her side of the fence.

In his deposition, which Beyke included as part of her evidentiary submission, Brown testified that when he and his wife Marquart purchased the north lot from Akin, he did not have any discussions with Akin regarding the location of the boundary line. He also said that he had no knowledge of when the fence at issue was erected or of what Beyke did to maintain the yard or the side of the fence facing her yard. In her deposition, Marquart testified that, originally, she believed that the fence at issue was the boundary line between the two lots. She also said that, before Brown and she had a survey done to determine the boundary line, she did not know where the boundary line should be.

---

[2]Marquart and Brown moved to strike portions of Akin's and Beyke's affidavits, which the trial court granted as part of the summary judgment. We have not considered the challenged portions of Beyke's and Akin's affidavits.

Brown testified that he and Marquart had lived next door to Beyke for two years when, in July 2022, the original fence had deteriorated to such an extent that he wanted to replace it. He said that he talked with Beyke about it and that she did not want him to do any work on the fence. The day after they spoke about the fence, Brown said, Beyke painted a red line on the curb and installed security cameras on the side of her house facing the north lot. He said he wondered why Beyke was "being so aggressive" and was taking what he said was "a proactive, aggressive stance" regarding the fence, and that that was the first time that he considered that there may have been an issue regarding the property line. When he took a close look at the existing fence, Brown said, he noticed that after the first forty feet running from the backyard towards the front yard, that is, from west to east, the fence began to veer north for the last ten feet.

Brown testified that Marquart and he hired a surveyor, who determined that the existing fence was about three feet inside the boundary line, i.e., three feet inside the north lot. According to the survey, the north lot was approximately 97 feet wide from north to south and 150 feet long from east to west. Based on the survey, Marquart and Brown

6

hired a fencing company to take down the fence, which was deteriorating, and to put up a new fence along what they say is the correct boundary line as determined by the surveyor. Marquart and Brown both testified that, as the workers for the fencing company took down the fence, Beyke followed after them and replaced the fence with a new, temporary fence. Brown said that Beyke then put up "no trespassing signs" on the temporary fence, and she prevented the new fence from being erected on what Marquart and Brown contend is the correct boundary line.

On May 15, 2024, the trial court entered a summary judgment in favor of Marquart and Brown as to Beyke's claim for adverse possession "based on, among other things, [Beyke]'s undisputed testimony that adverse possession is her only basis to claim an interest in the [disputed strip] ...." It added that, for the reasons set forth in their motion for a summary judgment, Marquart and Brown were entitled to a summary judgment and that Beyke had no interest in the disputed strip. The trial court said that Beyke's other claims were dependent on a finding that she had prevailed on her adverse possession claim and, therefore, it dismissed those claims with prejudice.

7

The trial court established the boundary line between the two lots, determining that the correct boundary line was the line established in Marquart and Brown's survey, the subdivision plat, and other public documents. The trial court observed that, although Marquart and Brown had submitted an affidavit and a verified survey, Beyke had not opposed that survey with a verified survey of her own or with the affidavit of the person she had hired to conduct a survey. It also dismissed all other claims of both parties not specifically addressed. Neither party filed a postjudgment motion. Beyke filed a timely notice of appeal, and Marquart and Brown filed a conditional cross-appeal.

<u>Standard of Review</u>

This court conducts a de novo review of a summary judgment. <u>Williams v. State Farm Mut. Auto. Ins. Co.</u>, 886 So. 2d 72, 74 (Ala. 2003). In doing so, we apply the same standard that the trial court applied in determining whether a summary judgment was due to be granted; that is, we review the evidence in the light most favorable to the nonmovant, <u>Wilson v. Brown</u>, 496 So. 2d 756, 758 (Ala. 1986), and determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and is entitled to a judgment as a matter of law, Rule

56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So. 2d 949, 952-53 (Ala. 2004). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce evidence as to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin Cnty., 538 So. 2d 794, 797-98 (Ala. 1989).

A party seeking to acquire title to disputed property through adverse possession must support its claim with clear and convincing evidence. Henderson v. Dunn, 871 So. 2d 807, 810 (Ala. Civ. App. 2001). Therefore, to overcome a motion for a summary judgment challenging that party's adverse possession claim, the party must present evidence in support of its claim that, if accepted and believed by the fact finder, would constitute clear and convincing evidence of adverse possession. Phillips v. Asplundh Tree Expert Co., 34 So. 3d 1260, 1266 (Ala. Civ. App. 2007); see also Ex parte McInish, 47 So. 3d 767, 776 (Ala. 2008) (providing that, in the summary-judgment context, if a claim must be proven by clear and convincing evidence, "'"even if a trial judge reaches his or her own conclusion that the evidence presented does not clearly and convincingly establish [the subject fact], it is not for him or her to act upon that factual

9

determination, but to determine instead whether the actual fact-finder could reasonably make a different finding based upon the same evidence."'" (quoting KGS Steel, Inc. v. McInish, 47 So. 3d 749, 761-62 (Ala. Civ. App. 2006) (Murdock, J., concurring in result), quoting in turn Gary v. Crouch, 923 So. 2d 1130, 1142 (Ala. Civ. App. 2005) (Murdock, J., concurring in result))).

Analysis

Beyke contends that the trial court erred in finding that no genuine issue of material fact existed. She argues that she presented substantial evidence indicating that she had exercised exclusive possession over the disputed strip since 1995, when she purchased the south lot, and that her possession had been open, notorious, and hostile.

A party claiming ownership of property under a claim of statutory adverse possession may acquire title to the disputed property if, in addition to proving the elements necessary for proving adverse possession by prescription -- actual, exclusive, open, notorious, and hostile possession under a claim of right for a twenty-year period -- that party can also show that he or she holds the disputed property under color of title, has paid taxes for ten years, or derives title by descent cast

or devise from a possessor. See Kerlin v. Tensaw Land & Timber Co., 390 So. 2d 616, 618 (Ala. 1980); see also § 6-6-200, Ala. Code 1975. A different rule obtains, however, when the dispute involves the establishment of a boundary line between lots and not an attempt to acquire all or a significant portion of a conterminous landowner's property. In that circumstance, the requirements of statutory adverse possession need not be met in their entirety, but, instead, we apply what has been called a "hybrid" form of adverse possession. Buckner v. Hosch, 987 So. 2d 1149, 1152 (Ala. Civ. App. 2007). Under this hybrid form of adverse possession, "[i]n a boundary dispute, the coterminous landowners may alter the boundary line between their tracts of land by agreement plus possession for ten years, or by adverse possession for ten years." Kerlin, 390 So. 2d at 618.

Neither party argues that statutory adverse possession is applicable in this case, and we hold that it does not. Because Beyke is claiming adverse possession of the disputed strip, which is four feet wide at most and runs the length of the two lots (approximately ninety-seven feet), we conclude that she is not seeking a significant portion of the north lot and that, therefore, this case involves a boundary dispute as to which

the hybrid form of adverse possession applies. <u>See</u> <u>Holifield v. Smith</u>, 17 So. 3d 1173, 1178 (Ala. Civ. App. 2008).

There are two possible avenues for adverse possession between coterminous landowners: agreement plus possession for ten years, which Beyke has not asserted, and ordinary prescriptive adverse possession, which is, actual, exclusive, open, notorious, and hostile possession under a claim of right for ten years. <u>Collins v. King</u>, [Ms. SC-2023-0492, Mar. 22, 2024] ___ So. 3d ___ (Ala. 2024). In affirming the establishment of a boundary line between conterminous landowners, this court in <u>Shirey v. Pittman</u>, 985 So. 2d 484, 488-89 (Ala. Civ. App. 2007), quoted from <u>Brantley v. Helton</u>, 224 Ala. 93, 139 So. 283 (1932), a longstanding decision of the Alabama Supreme Court explaining that, whether a fence establishes a boundary line between conterminous landowners is a matter of the parties' intent. The <u>Brantley</u> court explained:

> "The controlling fact is one of intention. The mere fact that a mistake was made in locating the boundary, and there was never an intention to claim the property of another, does not negative adverse possession. Such a rule would make adverse possession to depend upon bad faith.
>
> "Was there an intention to fix a dividing line, each to have the enjoyment of his own property, and was possession taken and held accordingly, each claiming the property held as his own, because he considered it his own? If so, the

12

possession is adverse. Of course, adverse possession may arise from boldly and knowingly taking the property of another, or taking it regardless of whether he believes it is his, thus ousting the true owner, and holding in hostility to him.

"But in law a hostile possession is not limited to any such case. It is hostile when held as his own, claimed as his own, whether by mistake or willfully.

"There are certain cases of entry under the owner, or in recognition of joint ownership, and the like, when notice of a hostile possession must be brought home to the owner; but in boundary line cases, the inclosure of valuable lands ... and appropriation of same to a beneficial enjoyment, carries notice of an adverse claim to the adjoining owner, or puts him on inquiry."

224 Ala. at 96, 139 So. at 285.

In opposition to Marquart and Brown's motion for a summary judgment, Beyke presented undisputed evidence indicating that the fence that she claimed was the boundary between the north lot and the south lot was already in place when she moved into the house on the south lot in 1995. Marquart and Brown did not move in until more than twenty years later, in 2020, and they acknowledged that they had no knowledge regarding the existence of the fence before they moved in or whether Beyke had exercised exclusive possession over the disputed strip before they moved in. Beyke also presented acts of ownership, such as maintaining the disputed strip and her side of the fence that she says

13

established the boundary line, which constitutes evidence of "[o]penness, notoriety, and exclusiveness." Gonzalez v. Naman, 678 So. 2d 1152, 1155 (Ala. Civ. App. 1996) ("Openness, notoriety, and exclusiveness are shown by the doing of acts that could comport with ownership, i.e., such acts as would normally be performed by the owner in using his land to the exclusion of others."). This evidence, if believed by the trier of fact, was sufficient, in our view, to satisfy Beyke's obligation to support her claim of adverse possession with clear and convincing evidence.

In their brief on appeal, Marquart and Brown contend that Beyke cannot prevail on her claim for adverse possession because, they say, she gave five different locations for the boundary line in her deposition. Because she is unable to identify the exact location of the boundary line, they say, she cannot prove by clear and convincing evidence that she has obtained the disputed strip through adverse possession. Marquart and Brown's assertion that Beyke's identification of the boundary line as a "constantly moving target" misrepresents her testimony, however. Beyke has clearly and consistently insisted that the line established by the fence that was in place when she moved into the house on her lot constitutes the boundary line between the north lot and the south lot. The attorney

14

for Marquart and Brown acknowledged that during the deposition when, after Beyke stated unequivocally, that "[t]he original fence line is what I consider the boundary line," he said: "I know that. I understand that's your position in the case."

Marquart and Brown contend that, in addition to the fence line, Beyke claimed that a utility pedestal was situated on the boundary of the north lot and the south lot. They appear to assert that, in making that statement, Beyke had located the boundary line in a different place than the fence line when, in reality, Beyke was identifying where she believed the fence line ran as it reached the very back of the lots. Her testimony regarding her belief that the utility pedestal straddled the boundary line at the back of the lots is not inconsistent with her insistence that the fence line is the boundary line. The other examples that Marquart and Brown give for their contention that Beyke kept moving the location of the boundary line are confusing at best, but they also do not appear to be inconsistent with Beyke's testimony that she believed that the fence line constitutes the boundary line between the two lots.

Marquart and Brown also contend that, because a drainage pipe removing water from the north lot into a drainage culvert behind the

15

north lot and the south lot is buried underneath the property that Beyke is claiming, she cannot prevail on her claim for adverse possession because, they say, her use of the disputed strip was not exclusive. As Beyke explained in her deposition, initially, the drainage pipe was buried entirely on the north lot. However, she said, after the city performed work behind their lots, there was no longer an outlet for water to go straight from the drainage pipe into the culvert. Therefore, she said, she allowed the owners of the north lot to bury the "very last" of the drainage pipe under the fence, allowing the drainage pipe to enter into her property and out into the culvert. By doing so, Marquart and Brown argue, Beyke's use of the disputed strip was not exclusive.

To support their argument, Marquart and Brown rely on LaFlore v. Huggins, 392 So. 3d 500 (Ala. 2023). In that case, coterminous landowners both made use of a gully by disposing of yard debris in the gully, planting in the gully to prevent erosion, and eventually filling in a portion of the gully. LaFlore, 392 So. 3d at 504-505. Taken as a whole, the LaFlore court found, there was never a measurable span of time in which the party seeking to claim adverse possession exercised exclusive use of the property. Id. at 505. Here, however, once the drainage pipe was

16

buried -- with Beyke's permission -- its presence never interfered with her exclusive use of the disputed strip, which Beyke testified that she alone maintained.

It is well established that "'[e]xclusiveness of possession is often evidenced by the erection of physical improvements on the property, such as fences, houses or other structures.'" Strickland v. Markos, 566 So. 2d 229, 235 (Ala. 1990) (quoting 2 C.J.S. Adverse Possession § 54 (1972)) Burial of the drainage pipe underground did nothing to interfere with Beyke's exclusive use of the property on her side of the fence, which she maintains is the boundary. Marquart and Brown cite no authority to support their contention that an item that in no way interferes with the way one chooses to use her property precludes a finding of exclusive use that property. At best, the drainage pipe buried under property Beyke maintained as her own creates a question of fact as to whether the pipe deprived Beyke of exclusive use of the disputed strip. Therefore, we cannot say that the buried drainage pipe is sufficient to prevent a trial court from being clearly convinced that Beyke's use of the disputed strip was exclusive despite the presence of the buried pipe.

Marquart and Brown also contend that the Templetons, who owned the north lot when Beyke moved into the house on the south lot in 1995, permitted her to join her own fence to the existing fence to enclose at least a portion of the disputed strip. Because they gave her permission to enclose the disputed strip, they argue, Beyke's use of the property was permissive and not "exclusive." However, there is no evidence that the Templetons shared the use of the enclosed property. Furthermore, Marquart and Brown's argument fails to take into consideration that there is no evidence that Beyke had used the disputed strip with the permission of the subsequent owners of the north lot. Even if the Templetons did originally permit Beyke to use the disputed strip by permission (and we are not convinced that the evidence in the record requires such a conclusion), in their brief, Marquart and Brown do not say when the Templetons moved from the house on the north lot, but deeds in the record indicate that they no longer lived there by 2004, indicating that Beyke's use of the property had not been permissive for at least ten years. Once again, there is evidence in the record from which a trial court could be clearly convinced that Beyke's use of the disputed strip was not permissive.

Finally, Marquart and Brown argue that, because Beyke's brothers, see note 1, supra, did not make a claim to the disputed strip, she cannot show that she exerted actual possession of that property. They cite no authority to support that contention. In fact, as Beyke points out, Alabama law holds that "possession of property by one claiming to be a cotenant may establish title through adverse possession in all cotenants." Green v. Cottrell, 188 So. 3d 668, 672 (Ala. Civ. App. 2015). Therefore, Beyke's brothers' failure to pursue a claim of adverse possession over the disputed strip does not preclude Beyke from being able to sustain her claim.

Based on the record before us, we conclude that Beyke presented substantial evidence, clear and convincing in nature, demonstrating that genuine issues of material fact exist regarding her claim of adverse possession of the disputed strip and whether the boundary line between the north lot and the south lot had been established by the fence line that existed when Beyke moved into her house in 1995. In reaching this determination, we are not to be understood as holding that the fence line is, in fact, the boundary line. We hold only that, at this point in the litigation, i.e., at the summary-judgment stage, Beyke has presented

19

substantial evidence sufficient to overcome Marquart and Brown's contention that there exists no genuine issue of material fact and that they were entitled to a judgment as a matter of law.

The parties ask this court to reinstate their respective claims that the trial court dismissed when it entered the summary judgment regarding Beyke's claim for adverse possession. Because the summary judgment is reversed, it is necessarily set aside, meaning that there is no longer a final judgment and resolution of the remaining claims is subject to revision. See Miller v. Santiago, 642 So. 2d 446, 447 (Ala. 1994). The dismissed claims, which all appear to be dependent on a determination of the boundary line, can therefore be reinstated on remand. See id. Therefore, we also reverse that portion of the summary judgment dismissing those claims. Nonetheless, we leave it to the trial court to determine in the first instance whether reinstatement of those claims is warranted.

Conclusion

Based on the foregoing, we reverse the trial court's summary judgment to the extent that it found in favor of Marquart and Brown regarding Beyke's claim for adverse possession of the disputed strip and

to the extent that it dismissed the parties' other claims. The cause is remanded for further proceedings.

CL-2024-0513 -- REVERSED AND REMANDED.

CL-2024-0527 -- REVERSED AND REMANDED.

Moore, P.J., and Edwards, Hanson, and Lewis, JJ., concur.